Filed 8/25/15  P. v. Owens CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CURTIS JAMES OWENS, <br><br> Defendant and Appellant. | F067362 <br><br> (Super. Ct. No. CF99638241) <br><br> **OPINION** |

-ooOoo-

**THE COURT**[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Gomes, Acting P.J., Detjen, J. and Franson, J.

The Three Strikes Reform Act of 2012 (hereafter Proposition 36 or the Act) created a postconviction release proceeding for third strike offenders serving indeterminate life sentences for crimes that are not serious or violent felonies. If such an inmate meets the criteria enumerated in Penal Code section 1170.126, subdivision (e), he or she will be resentenced as a second strike offender unless the court determines such resentencing would pose an unreasonable risk of danger to public safety.[1] (§ 1170.126, subd. (f); *People v. Yearwood* (2013) 213 Cal.App.4th 161, 168.)

After the Act went into effect, Curtis James Owens (defendant), an inmate serving a term of 25 years to life in prison following conviction of felonies that were not violent (as defined by § 667.5, subd. (c)) or serious (as defined by § 1192.7, subd. (c)), filed a petition for resentencing under the Act. The trial court found defendant represented an unreasonable risk of danger to public safety and denied the petition.

We hold (1) the People met their burden of proving, by a preponderance of the evidence, facts on which a finding that resentencing defendant would pose an unreasonable risk of danger to public safety reasonably could be based; (2) the trial court's finding defendant posed a risk to the community was sufficient, under the circumstances, to establish an unreasonable risk of danger to public safety, and the trial court did not abuse its discretion in so finding; (3) the trial court's finding of dangerousness did not violate defendant's Sixth Amendment right to a trial by jury; (4) the trial court did not erroneously apply collateral estoppel to contested rules violations; (5) any error in the trial court's refusal of defense evidence was harmless; (6) defendant has failed to establish ineffective assistance of counsel; (7) defendant had no right to a continuance to allow him the opportunity to prove himself; and (8) recently enacted section 1170.18, subdivision (c) does not modify section 1170.126, subdivision (f). Accordingly, we affirm.

---

[1] Further statutory references are to the Penal Code unless otherwise stated.

## FACTS AND PROCEDURAL HISTORY

On November 5, 1999, defendant was convicted of attempted second degree burglary (§§ 459, 664; count one) and second degree burglary (§ 459; count two). He was sentenced to concurrent terms of 25 years to life in prison pursuant to sections 667, subdivisions (b) through (i) and 1170.12.

On November 15, 2012, defendant petitioned for resentencing under section 1170.126. The trial court made a preliminary finding defendant was eligible for resentencing, appointed counsel, and provisionally set the matter for hearing.[2] Several continuances were granted, in part so the parties could obtain and review pertinent court and prison records.

The People ultimately opposed the petition, asserting resentencing defendant would pose an unreasonable risk of danger to public safety. They pointed to defendant's lengthy, increasingly violent record, and set out a number of his offenses. In 1979, as a juvenile, defendant robbed a liquor store clerk at gun point. As an adult, defendant was convicted of five counts of robbery with use of a firearm for robberies committed during 1983 and 1984. He was sentenced to eight years in prison. In 1987, approximately two months after he was released on parole, he committed another armed robbery. He was convicted of several offenses arising out of that incident and sentenced to 11 years in prison. He violated parole in 1995, was convicted of two misdemeanor counts of domestic violence in 1998, and perpetrated the commitment offenses — vehicle burglary and attempted vehicle burglary — on August 12, 1999, while he was on probation for the domestic violence offenses.

The People also related defendant's prison classification score was 128, well above the minimum score of 19 for a life offender. They noted his "extensive"

---

**2** Although we refer to the trial court, the judge who originally sentenced defendant was no longer on the bench at the time the resentencing petition was filed. Accordingly, another judge was assigned to rule on the petition. (See § 1170.126, subd. (j).)

disciplinary write-ups and periods of housing in administrative segregation, and presented summaries of a number of California Department of Corrections and Rehabilitation (CDCR) 115 rule violation reports ("115's") and disciplinary chronos ("128's"), together with reasons defendant was placed in administrative segregation or the security housing unit (SHU).[3]  The 115's for which defendant was found guilty included, but were not limited to:

- *Participation in a riot (Jan. 11, 2012)*:  Full riot, with defendant identified as a participant.[4]

- *Destruction of state property (Dec. 15, 2010)*:  Defendant destroyed a sheet and when spoken to, said, "'FUCK YOU, GET YOUR PUNK ASS AWAY FROM MY DOOR.'"

- *Fighting (June 22, 2010)*:  Defendant was swinging both fists toward another inmate.

- *Possession of inmate weapon (Jan. 12, 2009)*:  A fight between defendant and another inmate was observed.  The inmates were ordered to the ground, but failed to comply and were pepper sprayed.  The inmates separated, and defendant was ordered to show his hands.  He refused, and flung an object toward the stairwell.  A piece of hard plastic, four and one-half inches long and one inch wide, sharpened to a point with the other end wrapped in cloth as a handle, was recovered.

- *Battery on a peace officer (Oct. 17, 2006)*:  An officer delivering milk to defendant's cell asked defendant to turn on a bright light.  Defendant appeared agitated.

---

[3]    "A 'CDC 115' violation is one that is 'believed to be a violation of law or [that] is not minor in nature,' and a '128 disciplinary chrono' is minor misconduct that recurs after verbal counseling.  [Citation.]"  (*In re Gomez* (2010) 190 Cal.App.4th 1291, 1299, fn. 3; see Cal. Code Regs., tit. 15, § 3312, subd. (a)(2), (3).)

[4]    The People's recitation of defendant's housing history showed defendant was continued in the administrative segregation unit on several occasions following the riot due to his promoting continued violence between Southern Hispanics and Black gangs.

4.

As the milk was placed on the security port door, defendant swatted at it and the cartons flew into the officer's leg.

- *Indecent exposure (Sept. 18, 2005)*:  During count, defendant was observed to have his shorts pulled down while he was masturbating.  He made no effort to stop or cover himself when the light shined into his cell.

- *Disrespect to staff (Dec. 10, 2004)*:  Defendant was asked why he was in a particular area and for identification.  He claimed not to have his identification card.  A search of his person revealed the card.  Asked why he lied, he responded, "'FUCK YOU PUNK'" and called the correctional officer names.

- *Theft (Apr. 2, 2004)*:  While the clerk at receiving and release was distracted with another inmate, defendant took a television and Walkman and put them in a box.  The television later was recovered from his cell and the Walkman was found elsewhere.

The People acknowledged defendant had "very modest" work and vocational history, but pointed out he had not taken advantage of any substance-related programming, anger management, or any program that might assist him in gaining insight into antisocial behaviors.  They asserted defendant had no documented self-help programming other than a brief period of participation in the Lifer Group, and argued he continued to exhibit poor impulse control and behaviors exhibiting violence and defiance, while doing little or nothing to address the factors involved in his criminality.

Defendant submitted a sworn declaration, in which he conceded he had a number of 115's and 128's, but claimed only some were true, most were not, and others had mitigating circumstances.  Defendant gave the following explanations for some of them:

- *Participation in a riot (115 rule violation dated Jan. 11, 2012)*:  Defendant was on the prison yard when, without warning, about 150 Black and Hispanic inmates began to brawl.  Defendant backed against a wall and deflected attempts to assault him, but did not fight.  He claimed medical records concerning treatment provided to participants would show he was one of the few without injury.  Nevertheless, on February 8, 2012, he was

5.

randomly selected, along with 20 others, for a four-month stint in SHU for his alleged participation.

- *Destruction of state property (115 rule violation dated Dec. 12, 2010)*: Defendant was assigned to a new cell, in which the current occupant had hung a sheet for privacy. "Somehow," defendant was blamed. Although the sheet was undamaged, he was charged $15 out of his commissary money.

- *Fighting (115 rule violations dated June 2, 2010, and June 22, 2010)*: While in church, defendant was "sucker-punched" by another inmate. The assault cut defendant above his right eye, and he grabbed the other inmate to smother the attack, but threw no punches. They fell to the floor and guards interceded. The prison hearing officer ruled it a mutual combat, although defendant disagreed. On the second date, the same inmate again attempted to assault defendant.

- *Delaying a prison official (115 rule violation dated Sept. 23, 2009)*: Defendant refused to have a certain individual as his cellmate, because the inmate was well known to defendant to be a dangerous man.

- *Possession of a weapon (115 rule violation dated Jan. 12, 2009)*: Defendant was found with a sharpened toothbrush. He admitted possessing it, but explained he did so for protection, having been threatened earlier with a stabbing by another inmate. Defendant related he had been "'shanked'" several times over the years while in prison, with the attack on one occasion nearly puncturing his lung.

- *Disrespecting others/staff (115 rule violations dated Aug. 15, 2008, Dec. 18, 2004, & Feb. 5, 2004)*: Defendant considered the correctional officers at High Desert State Prison, where he was held in 2008, "particularly racist." One of the female guards interfered with his mail and he called her a "'white bitch,'" which he realized he should not have done. Twice in 2004, he used "the 'F' word" on disrespectful Folsom staff.

- *Failure to attend school (128 disciplinary chronos dated July 31, 2008, Apr. 28, 2004, & Jan. 1, 2004)*: Defendant initially consented to go to classes, but soon learned

6.

the instruction was at elementary school level. Defendant was a high school graduate and wanted to attend college preparation or adult school, but such courses were not offered.

- *Battery on a prison official (115 rule violation dated Oct. 17, 2006)*: A correctional officer slid two milk cartons on a tray through the food slot in defendant's cell. Defendant, who had just awakened and was still groggy, clumsily reached for them and accidentally knocked both out of the hole. He was told one struck the guard on the leg.

- *Stealing/unauthorized acquisition (115 rule violations dated Jan. 25, 2006, & Apr. 2, 2004)*: In 2006, defendant purchased food for his cellmate, using the cellmate's identification with his consent. This was against prison rules. In 2004, defendant went to the receiving and release office to pick up several boxes of his own property. The attendant waved his hand at a pile and said they were defendant's and defendant could take them. When defendant got back to his cell, he opened a box and realized it was someone else's property. He was telling another inmate to notify a guard when a guard appeared and accused defendant of theft.

- *Indecent exposure (115 rule violation dated Sept. 18, 2005)*: Defendant was lying in bed, masturbating, around 3:00 a.m., when he realized a female guard was shining a flashlight on him. He denied purposely exposing himself to her or attempting to prolong the encounter.

- *Grooming (128 disciplinary chronos dated Sept. 28, 2004, & Jan. 1, 2004)*: On one occasion, defendant did not shave for a few days. On the other, he purposely began to grow a goatee. Both were in violation of Folsom's appearance regulations. Defendant shaved when faced with loss of yard privileges.

In his declaration, defendant stated he was currently 50 years old. He denied initiating any fights while in prison or being affiliated with any prison gang. He admitted defending himself on occasion, but never to a greater extent than necessary. He related

7.

that he had family who would help with his transition into the community, he would stay with his brother, and his brother had lined up work for him.

The petition was heard on April 19, 2013. The court stated it had read the People's opposition and defendant's declaration, and reviewed defendant's file. It found "things of concern" in defendant's custodial behavior. Although defendant had addressed some of them, the court permitted defense counsel to "amplify" the explanations contained in defendant's declaration.

Turning first to the rule violation for participation in a riot, defense counsel stated there were many documents related to the incident that contained various correctional officers' observations of participants, and defendant was not mentioned until the riot was over. Counsel noted defendant had no injuries, which, he argued, gave credence to defendant's claim he backed into the safest area he could and deflected all assaults on him. The prosecutor responded that in order to be "convict[ed]" of a 115, participation, not mere presence, was required. He represented evidence of defendant's participation was found.[5] The prosecutor conceded there was no evidence defendant instigated or was a "main player" in the incident, but he asserted defendant was a participant, and that was "what was sustained in a guilty finding." Defense counsel responded that according to defendant, he was accused of participating at the hearing, he denied it, and a guilty finding was made.

The court stated that, in looking at the "hierarchy" of conduct, it differentiated between "affirmative assaultive behavior" — particularly on correctional staff — and "defensive assaultive behavior." It found no affirmative assaultive behavior on correctional staff in defendant's background, but inquired about defendant's possession of a sharpened toothbrush. The prosecutor agreed the weapon was not used, but argued

---

**5**    Although it was this prosecutor's practice to summarize, rather than submit, the underlying prison documents, he had them available for the court's review.

that by defendant's own statement, it was being held for use, and even keeping it in a defensive manner suggested a willingness to apply deadly force. Defendant responded that he was holding the toothbrush for protection against the same inmate who had assaulted him. As for the fighting in 2010, the prosecutor asserted defendant was a full participant in the fight and appeared to be the aggressor. Defense counsel related that when defendant denied starting the fight, the hearing officer deemed it mutual combat. The prosecutor pointed out the finding was "fighting," not "mutual combat," and that while the prosecutor did not know whether defendant's assertion he was sucker punched was true, defendant was observed beating the other inmate.

The court next turned to the November 2006 finding of battery on a peace officer, which was based on the milk carton incident. It noted it did not appear a weapon was used or the officer injured. The prosecutor agreed with that assessment, but argued the concern was defendant's attitude, which he exhibited during that period of his incarceration, and his defiant conduct. The prosecutor also suggested defendant was "engaging in a little revision of the history."

The court stated it did not appreciate defendant's conduct, but, it acknowledged, "the prison atmosphere is a much different atmosphere. The behavior that occurs in prison appearing in a significantly different societal structure than out in public." The court also acknowledged the prosecutor's position, which was that there were rules in prison, and prisoners should follow those rules. The prosecutor argued there could be no doubt from the record that defendant had "an attitude problem," and there was no suggestion defendant had changed or would no longer engage in "defiant and difficult conduct" if released from prison.

Defense counsel responded that defendant had not incurred any 115's since January 2012, thus indicating defendant's behavior had indeed improved. He noted defendant's brother was present to discuss "outpatient" plans. Defendant's older brother, Melvin Collins, represented to the court that he had a stable home, and defendant would

9.

be able to stay with him.  Collins suggested they could work together at truck driving and that there were "[l]ots of things in the fire," but the outcome of the resentencing hearing had to be known first.

Defense counsel stated he was very familiar with actuarial research, and at defendant's age, it was "highly unlikely," unless there was "some severe pathology," that a person would continue to engage in robbery or "gross assaults" or similar offenses. Defense counsel noted the court was probably aware of that fact, but offered to provide the court with articles and other materials if the court was interested.  The court declined, but confirmed defendant was born in 1962 and was 50 years old at the time of the hearing.  The prosecutor stated he was also familiar with the data concerning age, and that he had no objection to the court getting a risk assessment, but he cautioned against generalizing.  He pointed out that defendant's criminal history dated back to when he was a juvenile, he failed probation and parole, and he persisted in his behaviors throughout his incarceration.  The prosecutor argued defendant's disciplinary violations were "very serious 115s in the context of a criminal history that is abysmal," and he urged the court to consider "a collective review of [defendant's] entire history, as well as his attitude and demeanor."

The court decided it wanted a risk assessment factoring in age.  It declined to give a tentative ruling, but referred the matter to the probation department to obtain an independent determination.  The court stated:

> "This is — I don't want to mislead [defendant].  This is a close call.  [The prosecutor] makes a very valid point.  On the other hand, what is significant to the Court is [the prosecutor's] points are factually accurate.  It is significant to the Court, … that while I'm not excusing [defendant's] conduct at all — for instance, the possession of the inmate manufactured weapon that [the prosecutor] notes to appear to be for defense purposes, there is nothing in the record.  [Prosecutor], I understand your point, a weapon is a weapon, and its presence in the institution creates a danger, per se; however, does not appear that there is any indication that [defendant] was possessing it to affirmatively attack given the previous attacks against

10.

him, and the way in which it apparently was possessed.  It appears to be a defense weapon, as does [defendant's] conduct.

"So — I don't — I understand [the prosecutor's] argument.  If I agree to everything [the prosecutor] was saying, I deny it today.  So that is why I am referring it over, because I think there is another side to this that creates a legitimate finding that [defendant], while perhaps not exemplar in the institution, would not create such a danger to the community under [section] 1170.126, that he should not be resentenced.  I will … ask specifically for a risk assessment factoring in age."

The court appointed Dr. Terrell to conduct the risk assessment, and continued the matter to a specific date for receipt of the report and the court's decision.  The court told defendant:  "I will decide it that day.  If there is too much there, and you are not appropriate for resentencing, I won't resentence you.  I don't know if it helps you or not, but we will make that decision that day.  I will not continue it out after that.  It is set over to that date.  [¶]  … It is a close call.  But I wouldn't refer you to probation if I didn't think there was a legitimate reason to resentence you.  I haven't made a decision."

The probation officer filed a report that related defendant said he had attended numerous religious classes since 2000, and completed a six month "Lifers" group course in 2008 and a 90-day behavioral management course, designed to deal with anger and stress issues, in October 2012.  The probation officer also noted prison documentation showing defendant received two certificates of accomplishment in August 2010 for keyboarding, as well as a certificate of achievement for completing a course on office services and related technologies.  Defendant told the probation officer he had changed his life from what he used to be, and was ready to be a productive citizen.  Based on a review of defendant's prior criminal history and disciplinary history while incarcerated, however, the probation officer observed:  "While [defendant] states that he has changed, his documented performance reveals otherwise.  This officer notes that prison life requires adjustments and is a stressful environment; however, it appears that the defendant has not taken advantage of opportunities to make positive changes."

11.

Accordingly, the probation officer recommended the court find defendant to be an unreasonable risk to public safety and that resentencing be denied.

Terrell submitted a report in which, in part, he related that the primary reason for defendant's longstanding criminal history was most likely defendant's antisocial personality disorder. Terrell also noted, however, that people with antisocial personality disorder often show a decrease in their criminal behavior as they enter the fourth decade of life. Terrell stated it appeared defendant had been in slightly less trouble over the preceding five years or so; however, Terrell pronounced himself "gravely concerned" by defendant being in possession of a prison-made weapon in 2009, his reported participation in a prison riot, and his reported efforts to encourage more violence and retaliation at the prison after the 2012 riot. Terrell opined that defendant represented a moderate to high risk of violence to the community if released. He stated he would feel more optimistic about defendant's prognosis if and when defendant could maintain a period of at least four to five years without any antisocial, violent, or assaultive behavior. Terrell recommended denial of release at the present time.

The continued hearing was held on May 24, 2013. The court stated it had read and considered the probation officer's and Terrell's reports. Defense counsel stated that he spoke to Terrell after receiving the report, and Terrell related that he accepted virtually everything from the CDCR records "as gospel." When defense counsel mentioned actuarials indicating a 50-year-old man was not going to be recidivating, particularly in a violent fashion, as a 25- or 30-year-old would, Terrell said he was unfamiliar with them. Defense counsel then sent Terrell several hundred pages of studies and other information on that point, because Terrell said he might be willing to reconsider.

Defense counsel argued that defendant had no actual violence until about 2009, when he was attacked and armed himself in self-defense. As for the riot, defendant had no notice beforehand that it was going to occur, and he had very passive participation. Defense counsel related that, according to defendant, out of the 300 inmates involved, 10

12.

Hispanics and 10 Blacks, of whom the guards were not very fond, were selected and placed in SHU. Most recently, defendant had had 17 months of "spotless" behavior.

With respect to Terrell's diagnosis of antisocial personality disorder, defense counsel pointed out Terrell noted, as did the actuarial information, that the disorder began to remit after the fourth decade of life, and defendant was about to enter his sixth decade. Accordingly, counsel asserted, there was no indication defendant would continue to behave in an antisocial fashion. Defense counsel noted defendant had never hurt anyone. He also represented that, because defendant had had an addiction to methamphetamine at one point, defendant was willing to do an inpatient program to make sure it did not recur; defendant was originally a truck driver and had the potential for employment through his brother; and defendant was willing to continue an anger management program. Defense counsel asked the court to accept defendant's declarations and consider some form of supervision for him, or, alternatively, to permit counsel to provide the actuarial documents to Terrell, the court, and the prosecutor, and to cross-examine Terrell on that point. The final alternative defense counsel suggested was for the court to encourage defendant to continue his violation-free behavior by returning defendant to prison for six months to a year, retaining jurisdiction, and, if defendant could "follow the Court's view of probation in a sense, then … give him the benefit of the doubt and … consider releasing him."

The prosecutor objected to defense counsel testifying and submitting additional information, although he had no problem with counsel augmenting the record by bringing in someone if the court was willing to have that person testify. The prosecutor noted that a risk assessment was "a broad-spectrum analysis of an individual and their propensity for violence or recidivism," which was the type of examination Terrell submitted. The prosecutor was against some level of supervision for defendant, because he did not believe someone who had a moderate to high risk of violence should be released in the first instance. As for the possibility of continuing the case and assessing defendant's

conduct in the future, the prosecutor felt it might be appropriate in some cases, but not in defendant's situation because, as Terrell stated, defendant would need a period of several years in order for anyone to feel confidence his level of risk was reduced.

The court informed defense counsel that it did not consider counsel's statements to be evidence. Defense counsel responded that if the prosecutor wanted "backing on that," counsel could put defendant on the stand to support everything counsel said regarding the aftermath of the "alleged" riot, and counsel could also call Terrell to confirm what they discussed, that he did not make his decision based on any statistics, and that it essentially was a psychiatric examination. Counsel observed that a lengthy period of violation-free behavior was not available in this case, and he asked the court to consider the defense's three possibilities: allowing defense counsel to present further evidence, in which case counsel would need a hearing date toward the end of June; supervision or programs; and/or retain jurisdiction while defendant did an additional period in prison with the warning "sink or swim."

The prosecutor asked to comment, but the court refused, saying it was ready to rule. It stated:

> "I've considered both comments, I have gone through the reports.… [F]rankly, some of the suggestions each of you make are suggestions that, had those who created the statute thought ahead, would be very useful to the Court in this circumstance.
>
> "However, [defense counsel], … I am more than concerned. I have reviewed, as I do in every single one of these cases, I look for options, recognizing the impact of the Court's ruling and the finality of the ruling. If I can find an option that I believe is appropriate and will assure this court that the individual is not a danger, I pursue it. I don't see that option here.
>
> "[Defendant], as recently as 2010, while it might appear minor, had a face-to-face confrontation with the correctional officer where he stated — and pardon my language, but I need to be direct on the record — 'Fuck you, get your punk ass away from the door.'

14.

"Prior to that, he was found in possession of a four-and-half-inch-long sharpened instrument. And, it — if that type of behavior was a decade ago — but it's not, it's within the past three to four years.

"I find at this point that [defendant] does pose a danger of risk to the community, and for those reasons his request for … resentencing is denied.

"While I perhaps do not need to supplement the record, the fact is as [defendant] left the courtroom, his physical demeanor towards the Court appeared to be at least threatening, if not directly confrontational."

## DISCUSSION

## I

### THE STANDARD OF PROOF AND THE TRIAL COURT'S FINDING

Subdivision (f) of section 1170.126 provides that where, as here, an inmate petitioner is eligible for resentencing under the Act, he or she "shall be resentenced [as a second strike offender] unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."

Defendant contends the prosecution failed to prove "unreasonable risk of danger to public safety," which we will sometimes call "dangerousness," beyond a reasonable doubt, thereby violating the due process clause of the Fourteenth Amendment to the United States Constitution. The applicable standard of proof, however, is preponderance of the evidence. (*People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1301-1306 (*Kaulick*); accord, *People v. Flores* (2014) 227 Cal.App.4th 1070, 1075-1076; see *People v. Blakely* (2014) 225 Cal.App.4th 1042, 1060-1062 [applying *Kaulick* to initial eligibility determination]; *People v. Osuna* (2014) 225 Cal.App.4th 1020, 1038-1040 [same]; see generally *People v. Arriaga* (2014) 58 Cal.4th 950, 961-962.) Defendant argues *Kaulick* was wrongly decided, but we are not persuaded.

Considering the language of subdivisions (f) and (g) of section 1170.126,[6] we conclude the People have the burden of establishing, by a preponderance of the evidence,

_____

[6] Section 1170.126, subdivision (g) provides: "In exercising its discretion in subdivision (f), the court may consider: [¶] (1) The petitioner's criminal conviction

15.

facts from which a determination resentencing the petitioner would pose an unreasonable risk of danger to public safety can reasonably be made. The reasons a trial court finds resentencing would pose an unreasonable risk of danger, or its weighing of evidence showing dangerousness versus evidence showing rehabilitation, lie within the court's discretion. The ultimate determination that resentencing would pose an unreasonable risk of danger is a discretionary one. While the determination must be supported by facts established by a preponderance, the trial court need not itself find an unreasonable risk of danger by a preponderance of the evidence. (See *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1065-1067 [discussing abuse of discretion and preponderance of the evidence standards].)[7]

In the present case, the People established, by a preponderance of the evidence, facts — particularly defendant's prison disciplinary write-ups and lack of a record of meaningful rehabilitation while incarcerated — from which the trial court reasonably could find resentencing defendant would pose an unreasonable risk of danger to public

---

history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety."

[7] We reject defendant's apparent suggestion due process requires at least a clear and convincing evidence standard of proof. The situations noted by defendant in which such a standard has been applied (see *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 546-548 & cases cited) are not analogous to the act of lenity contained in section 1170.126.

We recognize that in the case of people who are involuntarily committed as narcotics addicts or for analogous reasons, the California Supreme Court has found the appropriate standard of proof to be beyond a reasonable doubt. (See, e.g., *People v. Thomas* (1977) 19 Cal.3d 630, 637-638.) Defendant received the protections of that standard of proof (and the right to a jury trial) at the time he was found to have suffered his prior strike convictions, however. (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1015; *People v. Towers* (2007) 150 Cal.App.4th 1273, 1277.)

16.

safety.**8**  Because the trial court's finding defendant currently posed an unreasonable risk of danger to public safety did not "exceed[] the bounds of reason, all of the circumstances being considered" (*People v. Giminez* (1975) 14 Cal.3d 68, 72), it did not constitute an abuse of discretion.

Defendant argues, however, that what the court actually found was that defendant posed "a danger of risk to the community." He says this finding was insufficient, as a matter of law, to establish the "unreasonable risk of danger to public safety" required by subdivision (f) of section 1170.126 before resentencing could be denied.

It is apparent, from the oral and written submissions of the parties and probation officer, and the court's comments throughout the proceedings, that the court was aware of the law on this point and the finding it was required to make. (See Evid. Code, § 664; *People v. Diaz* (1992) 3 Cal.4th 495, 567.) It is also apparent the court was convinced resentencing defendant would pose an unreasonable risk of danger to public safety. That it stated its finding unartfully does not mean it failed to make the requisite finding.

---

**8**     The substantial evidence test applies to an appellate court's review of findings made under the preponderance of the evidence standard. (*People v. Wong* (2010) 186 Cal.App.4th 1433, 1444.) Under that test, the appellate court reviews the record in the light most favorable to the challenged finding, to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could make the finding by a preponderance of the evidence. The appellate court "resolve[s] all conflicts in the evidence and questions of credibility in favor of the [finding], and … indulge[s] every reasonable inference the [trier of fact] could draw from the evidence. [Citation.]" (*Ibid*.)

If a factor (for example, that the petitioner recently committed a battery, is violent due to repeated instances of mutual combat, etc.) is not established by a preponderance of the evidence, it cannot form the basis for a finding of unreasonable risk. (See *People v. Cluff* (2001) 87 Cal.App.4th 991, 998; cf. *People v. Read* (1990) 221 Cal.App.3d 685, 689-691.)

## II

## J<span>URY</span> T<span>RIAL</span> R<span>IGHT</span>

Relying primarily on *Alleyne v. United States* (2013) 570 U.S. ___ [133 S.Ct. 2151], defendant contends his Sixth Amendment jury trial right was violated by the fact the court, rather than a jury, made the necessary finding of dangerousness. In *Alleyne*, "the United States Supreme Court held that the federal Constitution's Sixth Amendment entitles a defendant to a jury trial, with a beyond-a-reasonable-doubt standard of proof, as to 'any fact that increases the mandatory minimum' sentence for a crime." (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 39, fn. 6.)

"The denial of a recall petition [under the Act] does not increase the mandatory minimum sentence for a defendant's crime." (*People v. Guilford* (2014) 228 Cal.App.4th 651, 663, fn. omitted.) As the Court of Appeal explained in *Kaulick*, *supra*, 215 Cal.App.4th 1279: "The maximum sentence to which Kaulick, and those similarly situated to him, is subject was, and shall always be, the indeterminate life term to which he was originally sentenced. While Proposition 36 presents him with an opportunity to be resentenced to a lesser term, unless certain facts are established, he is nonetheless still subject to the third strike sentence based on the facts established at the time he was originally sentenced." (*Id*. at p. 1303.) Because resentencing a petitioner under the Act is not constitutionally required, but rather "an act of lenity on the part of the electorate" (*Kaulick*, *supra*, at p. 1304) that "provides for a proceeding where the original sentence may be modified downward (*Id.* at pp. 1304-1305), "[a]ny facts found at such a proceeding, such as dangerousness, do not implicate Sixth Amendment issues" (*id*. at p. 1305; accord, *People v. Osuna*, *supra*, 225 Cal.App.4th at p. 1040).

# III

## COLLATERAL ESTOPPEL

In a somewhat confusing argument, defendant next contends the trial court erroneously gave collateral estoppel effect to the various 115 violations contained in his prison disciplinary record. The record on appeal belies this assertion.[9]

"Collateral estoppel precludes relitigation of issues that were necessarily decided in prior litigation, but it operates only against those who were parties, or in privity with parties, to that prior litigation and who are thus bound by the resulting judgment. The party seeking the benefit of the doctrine, by contrast, need not have been a party to the earlier lawsuit. [Citation.]" (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 985.) "There are five threshold requirements: 1) the issue to be precluded must be identical to that decided in the prior proceeding; 2) the issue must have been actually litigated at that time; 3) the issue must have been necessarily decided; 4) the decision in the prior proceeding must be final and on the merits; and 5) the party against whom preclusion is sought must be in privity with the party to the former proceeding. [Citations.]" (*People v. Garcia* (2006) 39 Cal.4th 1070, 1077.)

As previously described, defendant incurred a number of 115 rule violations and 128 disciplinary chronos during the course of his imprisonment. During the court and parties' discussion of defendant's disciplinary record, both counsel made a number of references to guilty or adverse "findings." For instance, with respect to the 115 based on participation in a riot, the prosecutor referred to a "guilty finding" that defendant was a participant. Defense counsel agreed a guilty finding was made, but disagreed the finding was based on evidence in the records.

---

[9] This being the case, we need not decide whether, as asserted by the Attorney General, defendant forfeited his claim by failing to raise it below.

19.

We fail to discern anything wrong with the parties' references to the prison's "findings." Our reading of the record does not suggest the prosecutor was seeking to have the court give preclusive effect to the prison's findings, but rather he was arguing defendant's denials of wrongdoing and innocent explanations lacked credibility. Whatever the prosecutor's intent, it is absolutely clear from the record that the court took defendant's explanations, claims of self-defense, and denials of wrongdoing fully into account in reaching its decision, and did not give preclusive effect to prison findings.

## IV

### REFUSAL OF DEFENSE EVIDENCE

Defendant contends the trial court abused its discretion or failed to exercise informed discretion, denied defendant his right to a full and fair adversarial proceeding, and violated his right to due process, by its "refusal" of defense evidence of (1) actuarial documents and research, and (2) cross-examination of Terrell. We conclude that if error occurred, it was harmless.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful *opportunity* to present a complete defense.' [Citations.] We break no new ground in observing that an essential component of procedural fairness is an *opportunity* to be heard. [Citations.]" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690, italics added.) The parties to a resentencing proceeding pursuant to section 1170.126, subdivision (f) have a right, both as a matter of due process and of judicial discretion, to a full and fair adversarial proceeding in which they *may* present evidence and argument. (*Kaulick*, *supra*, 215 Cal.App.4th at pp. 1297-1298.)[10]

---

**10** We recognize a criminal defendant is not necessarily guaranteed the same panoply of rights at sentencing as he or she is at trial. (See, e.g., *Williams v. New York* (1949) 337 U.S. 241, 251.) For example, it has been held a defendant has no right to cross-examine a

Nothing in the record before us suggests defendant was precluded from presenting evidence at either the initial or the continued hearing; rather, it appears he was not prepared to do so.[11] The trial court appointed Terrell on April 19, 2013. Terrell examined defendant on May 17, 2013, and his report was dated May 19, 2013. The record contains no explanation why defense counsel did not speak to Terrell, and/or send him the actuarial materials, before Terrell spoke with defendant or at least before he prepared his report, particularly in light of the fact Terrell had before him a letter from defense counsel dated April 22, 2013, and the trial court had warned the hearing would not be continued further. The record also contains no indication defense counsel attempted to subpoena Terrell, or otherwise obtain his presence, for the hearing with a view to cross-examining him on his report.

Significantly, defendant's age and age's effect on recidivism were before the court in Terrell's report, albeit perhaps not to the extent defendant would have liked, and the prosecutor did not dispute that evidence. The bottom line was not what *actuarial* evidence would show, but what evidence concerning *this defendant* showed regarding his likelihood of recidivism, particularly with respect to crimes of violence. The court declared itself "more than concerned" by incidents that occurred within the past three to four years, and a fair reading of the record shows the court denied defendant's petition for resentencing based in large part on those recent incidents. Under the circumstances, defendant and his counsel did indeed "enjoy[] a full and fair *opportunity* to marshal and present the case supporting a favorable exercise of discretion" (*People v. Rodriguez* (1998) 17 Cal.4th 253, 258, italics added) and, in light of the evidence and information

---

probation officer who prepared a probation report. (*People v. Smith* (1985) 38 Cal.3d 945, 960.) It is unclear whether this limitation extends to an expert like Terrell in a section 1170.126 proceeding. (See *People v. Arbuckle* (1978) 22 Cal.3d 749, 753-756.) In any event, we need not decide the extent of a petitioner's rights at a resentencing proceeding under the Act.

[11] Defendant did present some evidence, in the form of his sworn declaration.

already before the court and the court's comments and basis for its denial of resentencing, any erroneous refusal of evidence could not have prejudiced defendant (see, e.g., *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 660-661; *People v. Ramos* (2004) 34 Cal.4th 494, 528).

# V

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends counsel was prejudicially ineffective. The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal … upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

Defendant contends counsel's performance was deficient because, he asserts, counsel unreasonably "kept himself in the dark" about Terrell's analysis; failed, in a timely manner, to consult Terrell, ask "the relevant actuarial question," and provide the relevant actuarial documents and research; and failed to subpoena Terrell to the hearing. "Even assuming for argument's sake that a competent attorney would have taken the actions defendant suggests, he fails to meet his burden of establishing, as a demonstrable reality, the prejudice requisite to a meritorious claim of ineffective assistance of counsel. [Citation.] '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.' [Citation.] On this record, which amply supports the determination

22.

[resentencing defendant would pose an unreasonable risk of danger to public safety], we cannot say a more favorable outcome was reasonably probable had counsel [presented additional information or materials to Terrell or evidence to the court, consulted Terrell in a timely manner, or otherwise changed the manner in which he dealt with Terrell and Terrell's analysis]." (*People v. Lawley* (2002) 27 Cal.4th 102, 136.)

## VI

### FAILURE TO EXERCISE INFORMED DISCRETION

Defendant contends the matter must be reversed and remanded for an informed exercise of discretion, because the trial court misunderstood the scope of its discretion, and erred as a matter of law, in concluding section 1170.126 did not authorize a lengthy continuance to afford defendant the opportunity to prove himself. We conclude the trial court lacked jurisdiction to grant such a continuance, and so did not err.

"Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing. [Citations.] Defendants are entitled to 'sentencing decisions made in the exercise of the "informed discretion" of the sentencing court,' and a court that is unaware of its discretionary authority cannot exercise its informed discretion. [Citation.] [¶] Remand for resentencing is not required, however, if the record demonstrates the trial court was aware of its sentencing discretion. [Citations.] Further, remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record. [Citation.]" (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228-1229; see *People v. Downey* (2000) 82 Cal.App.4th 899, 912.)

We are not convinced the record establishes the trial court would have granted defendant's alternative request for a lengthy continuance had it believed it had discretion to do so. All the court stated in that regard was, "[S]ome of the suggestions each of you

23.

make are suggestions that, had those who created the statute thought ahead, would be very useful to the Court in this circumstance. [¶] … I have reviewed, as I do in every single one of these cases, I look for options, recognizing the impact of the Court's ruling and the finality of the ruling. If I can find an option *that I believe is appropriate* and will assure this court that the individual is not a danger, I pursue it. I don't see that option here." (Italics added.) It then turned to a discussion of recent incidents that caused it to be "more than concerned."

In any event, we conclude the trial court had no discretion to grant a lengthy continuance, or otherwise retain jurisdiction for a period of time, so defendant could "prove" himself. Subdivision (b) of section 1170.126 allows any inmate who falls within the Act's provisions to file a petition for a recall of sentence within two years of the Act's effective date (Nov. 7, 2012), or at a later date upon a showing of good cause. Subdivision (f) of the statute requires the court, "[u]pon receiving a petition," to determine the petitioner's eligibility for resentencing, and, if the petitioner is eligible, to resentence him or her unless the court finds dangerousness.

The language of the statute as a whole, as well as evidence of the electorate's intent in enacting Proposition 36 shown in the ballot materials related to the Act (see generally Voter Information Guide, Gen. Elec. (Nov. 6, 2012) Prop. 36, pp. 48-53) demonstrates the proper focus in a resentencing proceeding under the Act, as in parole cases, is on whether the petitioner *currently* poses an unreasonable risk of danger to public safety. (Cf. *In re Shaputis* (2008) 44 Cal.4th 1241, 1254; *In re Lawrence* (2008) 44 Cal.4th 1181, 1214.) There is a crucial distinction between resentencing proceedings under the Act and parole cases, however. The parole board can find an inmate serving a life term unsuitable for parole, but rehear the matter within a certain time to assess his or her behavior in prison, among other factors, to determine his or her dangerousness. The Act contains no such provision. Rather, it provides for a one-time determination of a petition filed within two years of the Act's effective date.

Construing the statutory language in the context of the statute as a whole and the overall statutory scheme, as we are required to do (*People v. Rizo* (2000) 22 Cal.4th 681, 685), we find nothing that expressly or implicitly authorizes a court to continue or otherwise hold in abeyance a petition for resentencing for the purpose of reexamining the inmate's dangerousness.  To the contrary, the Act's limiting an inmate to the filing of a single petition for resentencing within two years of the Act's effective date indicates an intent to resolve such petitions within a finite time period.  The drafters of the Act could have created a statutory scheme to allow the court to retain jurisdiction to reevaluate the danger posed periodically or at some future time.  They did not do so.  Moreover, the voter information guide states the Act will result in a one-time cost related to handling the resentencing petitions, not periodic evaluations to review an inmate's fitness for resentencing and possible release.  (Voter Information Guide, Gen. Elec. (Nov. 6, 2012), *supra*, analysis of Prop. 36 by Legis. Analyst, p. 50.)[12]

## VII

## PROPOSITION 47

On November 4, 2014, voters enacted Proposition 47, "the Safe Neighborhoods and Schools Act" (hereafter Proposition 47).  It went into effect the next day.  (Cal. Const., art. II, § 10, subd. (a).)  Insofar as is pertinent here, Proposition 47 renders misdemeanors certain drug- and theft-related offenses that previously were felonies or "wobblers," unless they were committed by certain ineligible defendants.  Proposition 47 also created a new resentencing provision — section 1170.18 — by which a person currently serving a felony sentence for an offense that is now a misdemeanor, may

---

[12]    Defendant points out that a petition for resentencing may be filed beyond the two-year limitation upon a showing of good cause.  (§ 1170.126, subd. (b).)  This is true.  That a court has the power to find good cause to excuse a late petition does not mean, however, it has the power to defer a ruling in order to monitor subsequent conduct.

25.

petition for a recall of that sentence and request resentencing in accordance with the offense statutes as added or amended by Proposition 47. (§ 1170.18, subd. (a).)[13]

Hidden in the lengthy, fairly abstruse text of the proposed law, as presented in the official ballot pamphlet — and nowhere called to voters' attention — is the provision the parties address in their supplemental briefs. Subdivision (c) of section 1170.18 provides: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." Section 667, subdivision (e)(2)(C)(iv) lists what are sometimes called "super strike" offenses.[14]

The question is whether section 1170.18, subdivision (c) now limits a trial court's discretion to deny resentencing under the Act to those cases in which resentencing the defendant would pose an unreasonable risk he or she will commit a new "super strike"

---

[13]     Proposition 47 also created a process whereby eligible persons who have already completed their sentences may have the particular conviction or convictions designated as misdemeanors. (§ 1170.18, subds. (f), (g).)

[14]     As set out in subdivision (e)(2)(C)(iv) of section 667, those felonies are: "(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code. [¶] (II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289. [¶] (III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288. [¶] (IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive. [¶] (V) Solicitation to commit murder as defined in Section 653f. [¶] (VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245. [¶] (VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418. [¶] (VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

offense. Defendant says it does, and it applies retroactively to his pending appeal. The People disagree. We agree with the People.[15]

"'In interpreting a voter initiative …, we apply the same principles that govern statutory construction. [Citation.]' [Citation.] '"The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.]"' [Citation.]" (*People v. Superior Court* (*Cervantes*) (2014) 225 Cal.App.4th 1007, 1014.) Thus, in the case of a provision adopted by the voters, "their intent governs. [Citations.]" (*People v. Jones* (1993) 5 Cal.4th 1142, 1146.)

To determine intent, "'"we look first to the words themselves. [Citations.]"' (*People v. Superior Court* (*Cervantes*), *supra*, 225 Cal.App.4th at p. 1014.) "'""When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it." [Citation.]' [Citation.]" (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.) On its face, "[a]s used throughout this Code," as employed in section 1170.18, subdivision (c), clearly and unambiguously refers to the Penal Code, not merely section 1170.18 or the other provisions of Proposition 47. (See *People v. Bucchierre* (1943) 57 Cal.App.2d 153, 164-165, 166; see also *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1254-1255; *People v. Vasquez* (1992) 7 Cal.App.4th 763, 766.)

This does not mean, however, that the definition contained in section 1170.18, subdivision (c) must inexorably be read into section 1170.126, subdivision (f). (Cf. *Marshall v. Pasadena Unified School Dist.*, *supra*, 119 Cal.App.4th at p. 1255.) "The literal language of a statute does not prevail if it conflicts with the lawmakers' intent …. [Citations.]" (*People v. Osuna*, *supra*, 225 Cal.App.4th at pp. 1033-1034.) "'The

---

**15** The issues presented here are currently on review before the California Supreme Court in *People v. Chaney* (2014) 231 Cal.App.4th 1391, review granted February 18, 2015, S223676; *People v. Valencia* (2014) 232 Cal.App.4th 514, review granted February 18, 2015, S223825; and numerous other cases.

apparent purpose of a statute will not be sacrificed to a literal construction.' [Citation.]" (*Cossack v. City of Los Angeles* (1974) 11 Cal.3d 726, 733.) Rather, "the literal meaning of a statute must be in accord with its purpose." (*People v. Mohammed* (2008) 162 Cal.App.4th 920, 927.) "[I]t is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the [voters] did not intend" (*In re Michele D.* (2002) 29 Cal.4th 600, 606), or would "frustrate[] the manifest purposes of the legislation as a whole .…" (*People v. Williams* (1992) 10 Cal.App.4th 1389, 1393.) "To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment. [Citation.]" (*In re Michele D.*, *supra*, 29 Cal.4th at p. 606; accord, *People v. Ledesma* (1997) 16 Cal.4th 90, 95.)

Thus, "'we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, …, and the statutory scheme of which the statute is a part. [Citations.]' [Citation.] We also '"refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.]" (*People v. Osuna*, *supra*, 225 Cal.App.4th at p. 1034.) We consider "the consequences that will flow from a particular interpretation" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387), as well as "the wider historical circumstances" of the statute's or statutes' enactment (*ibid.*). "'Using these extrinsic aids, we "select the construction that comports most closely with the apparent intent of the [electorate], with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' [Citation.]" (*People v. Osuna*, *supra*, 225 Cal.App.4th at pp. 1034-1035.)

Proposition 47 and the Act address related, but not identical, subjects. Reading them together, and considering section 1170.18, subdivision (c) in the context of the statutory framework as a whole (see *People v. Acosta* (2002) 29 Cal.4th 105, 112; *Lakin*

28.

*v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 658-659; *In re Cindy B.* (1987) 192 Cal.App.3d 771, 781), we conclude its literal meaning does not comport with the purpose of the Act, and applying it to resentencing proceedings under the Act would frustrate, rather than promote, that purpose and the intent of the electorate in enacting both initiative measures (see *People v. Disibio* (1992) 7 Cal.App.4th Supp. 1, 5).

As is evidenced by its title, the Act was aimed solely at revising the three strikes law. "By enacting the three strikes law, the Legislature acknowledged the will of Californians that the goals of retribution, deterrence, and incapacitation be given precedence in determining the appropriate punishment for crimes. Further, those goals were best achieved by ensuring 'longer prison sentences and greater punishment' for second and third 'strikes.'" (*People v. Cooper* (1996) 43 Cal.App.4th 815, 824.)[16]

A few months before the November 6, 2012, election, the California Supreme Court observed: "One aspect of the [three strikes] law that has proven controversial is that the lengthy punishment prescribed by the law may be imposed not only when … a defendant [who has previously been convicted of one or more serious or violent felonies] is convicted of another serious or violent felony but also when he or she is convicted of any offense that is categorized under California law as a felony. This is so even when the current, so-called triggering, offense is nonviolent and may be widely perceived as relatively minor. [Citations.]" (*In re Coley* (2012) 55 Cal.4th 524, 528-529.)

Clearly, by approving the Act, voters resolved this controversy in favor of strike offenders. Thus, one of the "Findings and Declarations" of the Act stated the Act would "[r]estore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime." (Voter Information Guide, Gen. Elec., *supra*, text of proposed law, § 1, p. 105.)

---

**16** This applies equally to the three strikes initiative measure that added section 1170.12 to the Penal Code. (See Historical and Statutory Notes, 50C West's Ann. Pen. Code (2015 ed.) foll. § 1170.12, p. 376.)

Nowhere, however, do the ballot materials for the Act suggest voters intended essentially to open the prison doors to existing third strike offenders in all but the most egregious cases, as would be the result if the definition of "'unreasonable risk of danger to public safety'" contained in section 1170.18, subdivision (c) were engrafted onto resentencing proceedings under section 1170.126, subdivision (f). That voters did *not* intend such a result is amply demonstrated by the fact an indeterminate life term remains mandatory under the Act for a wide range of current offenses even if the offender does not have a prior conviction for a "super strike" offense (§§ 667, subd. (e)(2), 1170.12, subd. (c)(2)), and that an inmate is rendered ineligible for resentencing under section 1170.126 for an array of reasons beyond his or her having suffered such a prior conviction (§ 1170.126, subd. (e)(2)).

Significantly, nowhere in the ballot materials for Proposition 47 were voters given any indication that initiative, which dealt with offenders whose current convictions would now be misdemeanors rather than felonies, had any impact on the Act, which dealt with offenders whose current convictions *would still be felonies*, albeit not third strikes. (See, e.g., Voter Information Guide, Gen. Elec. (Nov. 4, 2014) analysis of Prop. 47 by Legis. Analyst, pp. 35, 36; *id*., argument in favor of Prop. 47, p. 38; *id*., rebuttal to argument against Prop. 47, p. 39.)

In light of the foregoing, we cannot reasonably conclude voters intended the definition of "'unreasonable risk of danger to public safety'" contained in section 1170.18, subdivision (c) to apply to that phrase as it appears in section 1170.126, subdivision (f), despite the former section's preamble, "As used throughout this Code …."

We recognize "[i]t is an established rule of statutory construction … that when statutes are *in pari materia* similar phrases appearing in each should be given like meanings. [Citations.]" (*People v. Caudillo* (1978) 21 Cal.3d 562, 585, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 229, 237, fn. 6 &

disapproved on another ground in *People v. Escobar* (1992) 3 Cal.4th 740, 749-751 & fn. 5; see *Robbins v. Omnibus R. Co.* (1867) 32 Cal. 472, 474.)  We question whether Proposition 47 and the Act are truly in pari materia:  That phrase means "[o]n the same subject; relating to the same matter" (Black's Law Dict. (9th ed. 2009) p. 862), and the two measures (albeit with some overlap) address different levels of offenses and offenders.  In any event, "canons of statutory construction are merely aids to ascertaining probable legislative intent" (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 521, fn. 10); they are "mere guides and will not be applied so as to defeat the underlying legislative intent otherwise determined [citation]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.*, *supra*, 43 Cal.3d at p. 1391).

The Act was intended to reform the three strikes law while keeping intact that scheme's core commitment to public safety.  Allowing trial courts broad discretion to determine whether resentencing an eligible petitioner under the Act "would pose an unreasonable risk of danger to public safety" (§ 1170.126, subd. (f)) clearly furthers the Act's purpose.  Constraining that discretion so that all but the worst *felony* offenders are released manifestly does not, nor does it comport with voters' intent in enacting either Proposition 36 or Proposition 47.

Accordingly, Proposition 47 has no effect on defendant's petition for resentencing under the Act.  Defendant is not entitled to a remand with directions to resentence him to a second-strike term.[17]

### DISPOSITION

The judgment is affirmed.

---

[17]    Were we to conclude section 1170.18, subdivision (c) modifies section 1170.126, subdivision (f), we would conclude it does not do so retroactively.  Because we believe a finding of nonretroactivity would raise serious equal protection issues, we rest our holding on the reasoning set out in our opinion, *ante*.  (See *People v. Skinner* (1985) 39 Cal.3d 765, 769.)